Filed 8/12/26  Lockett v. Allen CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JESSICA LOCKETT, | B346277 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 25TRRO00076) |
| v. | |
| JUSTIN ALLEN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gia G. Bosley, Judge.  Affirmed.

Reel Fathers Rights and Nakisha Sandy for Defendant and Appellant.

Jessica Lockett, in pro. per., for Plaintiff and Respondent.

————————————

# INTRODUCTION

Justin Allen appeals from a five-year restraining order issued under the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) (DVPA).[1]  Because substantial evidence supported the trial court's factual findings, the trial court did not abuse its discretion in issuing the restraining order.  Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.  *Lockett Confronts Allen's Fiancée During a Custody Exchange, and Allen Brandishes a Firearm*

Allen and Jessica Lockett met in 2015 when they were serving in the United States Navy.  They dated for a short time, but ended their relationship in July 2016, shortly after the birth of their daughter, Z.

On November 3, 2024 Lockett, along with her boyfriend Seven Mason and her mother, traveled from Los Angeles, where Lockett lived, to San Diego, where Allen lived with his fiancée.  Lockett went to pick up Z., who was seven years old at the time.

The custody exchange did not go well.  When Lockett and Mason arrived at Allen's home at 8:30 p.m., Lockett rang the doorbell, and Allen's fiancée answered the door.  Lockett and Allen's fiancée began to argue and shout at each other.

---

[1]     Statutory references are to the Family Code.

Hearing the argument, Allen came downstairs to the front door, told Z. to go upstairs, and refused to let her leave with Lockett. According to Lockett's testimony, which the trial court found credible, Allen "pulled a gun, cocked a gun, and waved a gun" and said he would kill Lockett and her family. Allen said that his fiancée would beat up Lockett and that Mason would not be able to stop her.[2]

According to Mason, who also testified at trial, Allen came downstairs with a weapon concealed in his "rear waistband." Mason saw Allen brandish and cock the gun at him, Lockett, and Lockett's mother. Mason moved between Allen and Lockett and challenged Allen to a fight; Lockett said she felt safe because Mason was protecting her. Lockett and her companions went back to her car, and Lockett called the police.

The police arrived, detained Allen, viewed video recordings from a neighbor's doorbell camera, and released Allen. The officers asked Allen whether he had a firearm and searched the house, but they did not find a firearm or arrest him. Allen denied that any of the events described by Lockett occurred and said that he never had a firearm during the incident. He explained he keeps all of his weapons in a safe and "away from the children."

Allen did not let Z. leave with Lockett. He said he did not give Lockett custody of Z. at that time because Lockett "was

---

[2] Lockett testified about two other incidents of domestic violence, both in 2019, one where Allen slammed her head against a shower door in front of Z. and another where Allen threw Lockett's belongings out of her house and drove away with Z. The court found Lockett's testimony about these prior incidents of domestic violence credible. Allen denied these incidents occurred.

acting in a very violent and aggressive manner" and Allen did not "feel safe just handing [Z.] over while [Lockett] and her boyfriend were outside [the] door acting erratic."

The trial court viewed 12 videos taken from the neighbor's doorbell camera that show much (though not all) of the incident. The videos show that Lockett was agitated and aggressive from the beginning of the confrontation and that Mason played a major role in escalating the conflict by threatening Allen and his fiancée and trying to fight him. The videos confirm Allen went upstairs, returned downstairs, and stood at the open front door behind his fiancée. At one point Mason said to Allen, "I been waiting to beat that ass" and "I been waiting to beat you up." The videos also show Lockett trying to hit Allen's fiancée and yelling, "Let her go!" and "Give me my daughter!" The videos show Mason swinging his arms back and forth, threatening Allen and his fiancée, stating he likes to fight, and challenging Allen to a fight. One of the videos shows Allen making a movement that could have been him revealing a gun in his waistband. Mason's behavior appears to change at that point, and he yells several times, "That's what I thought." The videos, however, do not show Allen waving or cocking a gun.

B. *The Trial Court Grants Lockett's Request for a Domestic Violence Restraining Order and Issues a Statement of Decision*

The court found that Lockett's testimony was credible and that Lockett met her burden to show by a preponderance of the evidence past abuse by Allen. The court stated: Lockett's "testimony was that [Allen] brandished a gun on or about November 3, 2024 [and] racked the gun. The court looked at the

4

video, I think it was the fourth video, I saw [Allen] come down the stairs and reach in his waistband. You can't see the item that was pulled out, but . . . what I saw on the video was consistent with the testimony by [Lockett]. . . . I do agree that [Lockett's] behavior was not appropriate under the circumstances. I would characterize her behavior as aggressive toward [Allen's fiancée]. However, [Allen] became a more dominant aggressor in pulling out a gun in a situation where the parties were arguing regarding custody."

The trial court issued a five-year restraining order. The court also ordered Allen to have monitored visitation with Z. and allowed him and Lockett to communicate in a parenting application to discuss scheduling visitation. The court also ordered Allen to enroll in and complete a domestic violence treatment program and at least 12 parenting classes. The court stated: "My understanding is that there is a case in San Diego. Any further request regarding custody should be filed in that court. Any further request to modify or to rebut the presumption under [section] 3044 should be directed to the family law court in San Diego."

Allen filed a request for a statement of decision, listing 20 issues he wanted the court to address. The court issued a written statement of decision, summarizing the evidence and stating its findings.

In its statement of decision the court again stated it found credible Lockett's testimony that Allen walked down the stairs inside his home and that, as "he descended the stairs, he pulled a gun from inside his waistband and cocked it." The court also found Allen's testimony was not credible. The court stated that it had watched the surveillance videos from the neighbor's doorbell

5

camera and that they showed Lockett "arguing aggressively" with Allen's fiancée.  The court stated that Allen "was seen descending the staircase while reaching into his waistband as if grabbing an object.  Because of the movements of individuals within the frame, further movements of [Allen's] hands were blocked from the camera's view.  The movements that were captured were consistent with [Lockett's] testimony that [Allen] was reaching for a gun."  The court found the videos showed that Lockett was the "original aggressor" and that her "tone and demeanor were aggressive and threatening toward" Allen's fiancée.  The court found, however, that Allen "was the more dominant aggressor" and that his "actions in retrieving and cocking the firearm during the argument would not constitute self[-]defense or defense of others" and was "excessive."  Allen timely appealed.

## DISCUSSION

A.    *Governing Law and Standard of Review*
The DVPA authorizes the trial court to issue a restraining order "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220; see *J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 640-641.) "Under the DVPA, a court may issue a protective order "'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved," upon "reasonable proof of a past act or acts of abuse.""" (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115; see *J.H.*, at p. 641 [under section 6300, subd. (a),

6

"[c]ourts may issue a restraining order to achieve [the DVPA's] purpose upon 'reasonable proof of a past act or acts of abuse'"].)

Section 6211 defines "domestic violence" as "abuse perpetrated against," among others, a former cohabitant, a person with whom the respondent had a dating relationship, or a person with whom the respondent has had a child.  (§ 6211, subds. (b), (c), (d); see *Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166, 1175.)  "Abuse" within the meaning of the DVPA includes "behavior that has been or could be enjoined pursuant to Section 6320."  (§ 6203, subd. (a)(4).)  Section 6320, subdivision (a), in turn, authorizes the court to enjoin "'molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, telephoning, . . . contacting, either directly or indirectly, by mail or otherwise, [and] coming within a specified distance of, or disturbing the peace of the other party.'"  Abuse under the DVPA includes not only physical abuse or injury, but also "'[a]nnoying and harassing'" conduct.  (*In re Marriage of Brubaker & Strum* (2021) 73 Cal.App.5th 525, 536; see *K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981 [abuse includes conduct that ""destroys the mental or emotional calm of the other party""]; *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602 [abuse includes conduct that "disturb[s] the peace of the protected party"].)

The party seeking the domestic violence restraining order has the burden of demonstrating past abuse by a preponderance of the evidence.  (§ 6300, subd. (a); *Hatley v. Southard* (2023) 94 Cal.App.5th 579, 592.)  We review an order issuing a restraining order under the DVPA for abuse of discretion.  (*In re Marriage of D.S. & A.S.* (2023) 87 Cal.App.5th 926, 933; *In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.)  "'To

7

the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.'" (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.)

B.  *Substantial Evidence Supported the Trial Court's Findings, and the Court Did Not Abuse Its Discretion in Issuing the Restraining Order*

Allen does not argue threatening the mother of one's child with a firearm does not qualify as abuse under the DVPA. (See *In re Marriage of Davila & Mejia*, *supra*, 29 Cal.App.5th at p. 228 [by pointing a gun at his wife and threatening to kill her, the husband committed domestic abuse by placing his wife "'in reasonable apprehension of imminent serious bodily injury'"].) Instead, Allen claims it never happened.

In particular, Allen argues substantial evidence did not support the trial court's ruling because the collection of video recordings from the doorbell camera, which according to Allen is "the most reliable evidence of what occurred on November 3, 2024," "flatly contradicts" Lockett's testimony because it does not show Allen "draw, display, point, or brandish a firearm." Allen asserts: "Every piece of objective evidence contradicts the court's central finding. When the entire objective evidentiary record points in one direction and only uncorroborated testimony points the other way, substantial evidence cannot sustain the finding." Allen misunderstands the substantial evidence standard of review and the evidence in this case.

In reviewing the trial court's findings for substantial evidence, "'"we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings. [Citation.]

8

We must accept as true all evidence supporting the trial court's findings, resolving every conflict in favor of the judgment. [Citation.] We do not determine credibility or reweigh the evidence. [Citation.] If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding.'"'" (*In re Marriage of M.P. & M.C.* (2025) 116 Cal.App.5th 1096, 1106-1107; accord, *Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 116; see *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1144 ["The inquiry is whether substantial evidence supports the court's finding, not whether a contrary finding might have been made."].) "'The testimony of one witness, even that of a party, may constitute substantial evidence.'" (*In re Marriage of Ankola* (2020) 53 Cal.App.5th 369, 380.)

Lockett testified Allen brandished a gun, cocked it, and threatened to kill Lockett, her mother, and Mason. The court believed her. That was enough. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 ["'The testimony of a witness, even the party himself, may be sufficient.'"]; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208 ["[t]he testimony of a single credible witness—even if a party to the action—may constitute "substantial evidence"]; see also *Estate of Wardani* (2022) 82 Cal.App.5th 870, 885 ["under substantial evidence review, appellate courts defer to a trial court's credibility determinations"]; *DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 382 ["[i]n exercising substantial evidence review, an appellate court does not evaluate the credibility of the witnesses but defers to the trier of fact"].) Indeed, in "many domestic violence cases . . . the sole evidence of abuse will be the survivor's own testimony which, standing alone, can be sufficient

to establish a fact." (*In re Marriage of F.M. & M.M. supra*, 65 Cal.App.5th 106, 119.)

Mason testified Allen came downstairs with a gun in his waistband and brandished it. The court believed him. That, too, was enough. (See *People v. Mendoza* (2015) 240 Cal.App.4th 72, 86 ["although not required," corroborating testimony may constitute substantial evidence]; *Major v. Western Home Ins. Co.*, *supra*, 169 Cal.App.4th at p. 1208 [same].)

It is true, as Allen suggests, a witness's testimony may not constitute substantial evidence if that testimony is "physically impossible or inherently improbable." (*DeNike v. Mathew Enterprise, Inc.*, *supra*, 76 Cal.App.5th at p. 381; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 281.) And as Allen repeatedly points out, none of the individual videos shows him waving or pointing a gun. But one of the videos shows Allen making a movement (and Mason reacting to the movement) that, as the trial court found, was consistent with Allen displaying a weapon in his waistband. And, because the 12 videos did not capture every moment of the encounter, they did not make the testimony of Lockett and Mason that they saw a gun physically impossible or, given that one of the videos shows Allen making a motion consistent with brandishing a gun, inherently improbable. (See *Tucker v. Pacific Bell Mobile Services* (2010) 186 Cal.App.4th 1548, 1562 ["'[i]t is the exclusive function of the trial court to weigh the evidence, resolve conflicts and determine the credibility of witnesses'"].)

C.     *The Trial Court Had Jurisdiction To Grant Lockett's Request for a Restraining Order*

Allen argues that the trial court lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) to issue a restraining order because he and Lockett had a custody case in San Diego County Superior Court and that under section 3422 the court in San Diego had "'exclusive, continuing jurisdiction over the determination'" of which parent had custody of Z.  Allen argues that the trial court in Los Angeles County "had no authority to displace San Diego's exclusive jurisdiction through its emergency powers" and that the court in Los Angeles County "could act—if at all—only within the narrow confines of . . . section 3424's temporary emergency jurisdiction: a tool available 'only to protect the child' and only on a temporary basis."

The premise of Allen's argument is flawed.  The UCCJEA "ensures that only one state has jurisdiction to make child custody decisions at any time."  (*In re Kayla W.* (2023) 97 Cal.App.5th 99, 107.)  It is "a carefully crafted statutory scheme—enacted not just by California but also by 48 other states (excluding only Massachusetts)—to determine the appropriate forum for child custody proceedings and avoid conflicting state child custody orders."  (*In re L.C.* (2023) 90 Cal.App.5th 728, 735, fn. omitted.)  "'The UCCJEA is designed to avoid jurisdictional conflicts between states and relitigation of custody decisions, promote cooperation between states, and facilitate enforcement of another state's custody decrees.'"  (*A.H. v. Superior Court* (2023) 89 Cal.App.5th 504, 517; accord, *L.C.*, at p. 738-739; see *In re Ari S.* (2021) 69 Cal.App.5th 1125, 1130 [the UCCJEA "provides a framework to address custody

11

issues across states"]; *In re Marriage of Kent* (2019)
35 Cal.App.5th 487, 493 [the "UCCJEA determines the proper
jurisdictional situs as between interested states for litigation of
child custody determinations"].)  The UCCJEA "is the exclusive
method to decide the proper forum to adjudicate issues involving
a child subject to a sister-state custody order."  (*Kayla W.*, at
p. 105.)

There are no custody orders from other states at issue in
this appeal.  The record suggests there was some kind of divorce
proceeding in Michigan that affected custody of Z., but there is no
evidence of what the court in Michigan ordered.  And Allen is not
arguing the trial court's orders conflicted with any orders by a
Michigan court; he is arguing the trial court's orders had the
potential to conflict with the proceedings in a court in another
California county.  The UCCJEA addresses conflicting interstate,
not intrastate or intercounty, custody orders.

Citing *Grahm v. Superior Court* (2005) 132 Cal.App.4th
1193 and *N.S. v. D.M.* (2018) 21 Cal.App.5th 1040, Allen asserts
the "UCCJEA cannot be circumvented through parallel filings in
a different county."  *Grahm*, however, involved a custody order by
a New York court.  (*Grahm*, at p. 1195.)  *N.S.*, which the court
described as a "complex custody proceeding," involved a custody
order by a court in Illinois, as well as proceedings in Santa Clara
County and San Diego County.  (*N.S.*, at pp. 1045-1046.)  The
issue of whether custody should be adjudicated in Santa Clara
County or San Diego County, however, was decided on a motion
to change venue, not under the UCCJEA.  (See *id.* at p. 1046.)

Allen argues "section 3424, subdivision (d) does not merely
authorize court-to-court communication when another custody
proceeding is pending—it mandates it."  But again, section 3424

12

applies to communication between courts in different states, not different counties.  Section 3424, subdivision (d), provides: "A court of *this state* that has been asked to make a child custody determination under this section, upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, *a court of a state* having jurisdiction under Sections 3421 to 3423, inclusive, shall immediately communicate with the other court.  A court of *this state* which is exercising jurisdiction pursuant to Sections 3421 to 3423, inclusive, upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a *court of another state* under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order."  (Italics added.)  Section 3424 says nothing about communications between courts hearing child custody proceedings in different parts of the same state.

Finally, even if there were a UCCJEA provision that applied to child custody proceedings in different counties, as opposed to different states, Allen did not argue the trial court lacked jurisdiction to rule on Lockett's request for a domestic violence restraining order or ask the court to transfer Lockett's request to San Diego County Superior Court.  Unlike the parent in *N.S. v. D.M., supra,* 21 Cal.App.5th 1040, Allen did not make a motion to transfer venue from Los Angeles County to San Diego County.  (See *id.* at p. 1046.)  In his response to Lockett's request for a restraining order Allen accused Lockett of "attempting to usurp" the San Diego court's authority, and in his posttrial request for a statement of decision Allen asked the court to state

13

the "[f]actual and legal basis for the court's determination" Lockett's request for a restraining order was a "legitimate filing[ ] to prevent acts of domestic violence or abuse against herself, as opposed to a ruse to gain an advantage in an ongoing custody dispute in San Diego filed by [Allen] immediately after [his] filing of a request to modify child custody and visitation . . . ." But he did not argue the trial court did not have jurisdiction to rule on Lockett's request, under the UCCJEA or otherwise, or ask the court to transfer Lockett's request for a restraining order to the pending case in San Diego County.

## DISPOSITION

The domestic violence restraining order is affirmed. Lockett is to recover her costs on appeal.

SEGAL, J.

We concur:

MARTINEZ, P. J.

STONE, J.

14